[Cite as *State v. Doogs*, 2017-Ohio-6914.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                   Court of Appeals Nos. WD-15-073
                                                                        WD-16-027
        Appellee

                               Trial Court No. 2013CR0316

v.

Ronald J. Doogs                                 **DECISION AND JUDGMENT**

        Appellant                       Decided:  July 21, 2017

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold and Peter T. Halleck, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} This is a consolidated appeal from the judgments of the Wood County Court

of Common Pleas, convicting appellant following a jury trial of one count of rape in

violation of R.C. 2907.02(A)(1)(c) and (B), a felony of the first degree, and one count of

gross sexual imposition in violation of R.C. 2907.05(A)(5) and (C)(1), a felony of the

fourth degree, and sentencing him to serve 12 years and 6 months in prison. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} On June 20, 2013, appellant was indicted on one count of rape, two counts of sexual battery, one count of unlawful sexual conduct with a minor, and one count of gross sexual imposition. Appellant entered an initial plea of not guilty, and the matter eventually proceeded to a jury trial beginning September 9, 2015.

{¶ 3} At the trial, the victim, L.M., testified first. L.M. was 17 years old at the time of the trial. L.M. testified that appellant was her father's cousin, and that appellant moved into her father's house in 2011 or 2012, when she was in seventh grade. She described how appellant would provide her alcohol, beginning when she was 12 or 13 years old. She testified that he would pour her a full glass, and that she would get tipsy or a little buzzed. L.M. also testified that appellant later gave her cocaine when she was still 12 or 13 years old, and that he would give it to her whenever he returned from his trips driving semi-trucks.

{¶ 4} L.M. then testified that appellant began showing her pornographic videos. She described one time when she and one of appellant's son's friends were sitting next to appellant, who was watching a pornographic video while completely naked with a little yellow rag covering his penis. L.M. testified that this event took place at appellant's parent's house in Fostoria, Ohio.

2.

{¶ 5} L.M. next began testifying about sexual interactions that took place with appellant. She later testified that there were numerous events but that she only remembered a few in detail. She testified that the first time occurred at her house in Fostoria when her dad went to work and appellant was home with L.M. and her brother, T.M. L.M. testified that they were drinking at the time and watching television when appellant gave T.M. his bank card and told him to go to the bank to withdraw some money. After T.M. left, appellant gave L.M. a rubber dish glove, and guided her hand as she gave him a hand job. L.M. testified that they heard T.M. return during the incident. Appellant quickly got up, told L.M. to hide the glove on the side of the couch, and met T.M. at the door and gave him instructions on how to use the bank card. When he returned, appellant told L.M. that she was going to finish, and he guided her hand until he ejaculated.

{¶ 6} L.M. testified that the next time something occurred, appellant took her in his car purportedly to pick up his son. As they were driving, appellant stopped near some cornfields and pulled down his pants. L.M. testified that appellant made her give him another hand job, and this time appellant was touching L.M.'s breasts and inner thigh. When she pushed him off, appellant would reply "Don't, just let it happen, I already started." L.M. stated that a car approached and appellant pulled up his pants and sped off before he had an opportunity to ejaculate. She testified that they did not pick up appellant's son that night.

3.

{¶ 7} When asked why she never told her dad or anyone else that this was going on, L.M. testified that she thought she was in the wrong and was going to be punished for it. She testified that one time she was at appellant's parent's house and blurted out that she did not want to live anymore. Appellant then went into his parent's basement where his father kept a collection of guns, then came back upstairs and told her to shoot herself.

{¶ 8} L.M. then described a third time that appellant had her give him a hand job. She testified that appellant took her, T.M. and S.D., appellant's son, to see the movie, "Project X," at the mall. Appellant purchased tickets for T.M. and S.D., and then said that he and L.M. were going to go buy her some clothes. Appellant and L.M. then left the mall and drove to an empty church parking lot, where she gave him another hand job. They returned to the movie theater shortly before the movie ended.

{¶ 9} L.M. testified that sometime after the movie incident, appellant moved in with his girlfriend in Rising Sun in Wood County. On or about May 24, 2012, when appellant was 13 years old, appellant asked L.M. to come mow the lawn, which she had done one time before.[1] As she was mowing, appellant asked her if she wanted a drink. They went into the kitchen and appellant poured her the usual cup of alcohol. L.M. testified that she drank about one-third of the cup, and within 15 to 30 minutes she remembered things getting wobbly, and then she blacked out. While she was still

---

[1] The indictment stated that the rape occurred between April 16 and May 24, 2012.

4.

conscious, she remembers appellant attempting to put his hand down the front of her shirt.

{¶ 10} When L.M. regained consciousness, she remembered sitting on a couch next to appellant's friend, P.S. P.S. had a garbage can that L.M. could throw up in. Appellant was also there with a glass of water, and was telling L.M. that she needed to drink the water to sober up. L.M. testified that she threw up again and then blacked out. The next thing L.M. remembered was P.S. giving her a bath. L.M. told P.S. that somebody was coming to get her, and P.S. was reassuring her that she was going to be okay. Appellant came into the bathroom with another glass of water in his hand, but P.S. told him to get out.

{¶ 11} After that, the next thing L.M. remembered was appellant walking her out of P.S.'s house, and across the street to appellant's parent's house. Appellant tried to get her to sleep in the boat in his parents' driveway, but L.M. begged him to take her home. Appellant drove her back home and dropped her off in an alley near her house. During the drive, appellant kept telling L.M. that she could not say anything to anyone or she would get in serious trouble. L.M. testified that the next morning she awoke and "My stomach, I felt opened, I didn't feel right. My stomach, I had horrible, horrible pain in my stomach, my lower stomach."

{¶ 12} L.M. testified that since the incident, she has been seeing a mental health counselor to deal with her anxiety.

5.

{¶ 13} T.M. testified next. T.M. is L.M.'s older brother. At the time of the trial, he was 18 years old. T.M. testified that he frequently drank and did drugs with appellant during the time that appellant was living at their house. T.M. stated that he was always concerned not to involve L.M., because he did not want that around his sister. T.M. testified that he was nervous whenever appellant was alone with L.M., but when he would confront appellant, appellant reassured him that there was nothing to be worried about, then the two of them would drink or do drugs together. T.M. explained that the night appellant gave him his bank card to go get money, T.M. returned to find L.M. using the microwave, which he found strange because he thought she was asleep. T.M. testified that he only left and came back, he did not return in between.

{¶ 14} The state then called L.B. as its next witness. L.B. was involved in a romantic relationship with appellant from 2007 to 2012, while she was married to another person. In 2012, appellant lived with L.B. in her house in Rising Sun, Wood County, Ohio. L.B. testified that during their relationship, appellant viewed pornography of young girls; as related to her, "the younger the better." On May 24, 2012, L.B. was working, driving a truck, when she received several text messages from appellant wanting to know what time she would be home. L.B. testified that this made her feel uneasy because appellant did not normally communicate that much. L.B. stated that based on her experience with appellant, when appellant's behaviors were out of the ordinary, it was because he was "up to something," like drinking or drugs. Wanting to

6.

find out what appellant was up to, L.B. told him that she would be home an hour later than she actually was going to be.

{¶ 15} L.B. testified that when she arrived home, she found appellant in the bedroom with L.M., whom she had met approximately a dozen times before. When L.B. walked in, L.M. was lying on the bed on her back and did not appear to be awake. L.B. testified that appellant was sitting on the edge of the bed and had his hand inside L.M.'s shirt. When L.B. confronted appellant, he said that L.M. had passed out and he wanted to make sure that she was still breathing. L.B. and appellant started arguing, and L.B. testified that appellant told her that if she ever reported what she saw to anyone he would kill her and her son. L.B. then left the house and drove around in her truck.

{¶ 16} Twenty minutes later, L.B. returned to her house. She parked around the block and walked up to the back of her house. As she approached, L.B. looked through the kitchen window and saw appellant naked on the couch between a woman's legs. The woman was laying on her back on the couch, and L.B. could see her pants down around her left ankle.

{¶ 17} L.B. stormed into the house, and appellant, still naked and with an erection, came charging at her. L.B. testified that appellant pushed her down and pinned her arms above her head. Appellant stated that it was not his fault, that he was drunk and high, and that the girl came on to him. L.B. got up and left the house. She testified that while she was there, she did not hear any other movement or any other female voice in the house; nothing to suggest that the woman on the couch was conscious.

7.

{¶ 18} On cross-examination, L.B. testified that when she originally spoke with the police about the incident, she did not mention the part where she returned to her house and saw appellant naked on the couch. L.B. explained that she did not trust the Fostoria police department because appellant had a relationship with one or two of the officers or detectives. L.B. was worried that the police department would inform appellant about what she said, and that appellant would hurt her. On re-direct, L.B. testified that shortly after her interview with the police department, she sent a letter conveying the rest of the story.

{¶ 19} P.S. testified as the next witness for the state. P.S. was in a romantic relationship with B.C., whom she met while she was a nurse at a nursing home. B.C. had been involved in a car accident and was paralyzed from the waist down. P.S. testified that appellant and B.C. were friends, and that appellant would come over to her house on a nearly daily basis. Often, appellant and B.C. would do drugs together. P.S. also testified that L.M. came to her house on several occasions either with appellant or with L.M.'s dad.

{¶ 20} P.S. testified that around April or May 2012, she left her house to take B.C.'s brother home. When she left, B.C. was alone in the house, laying in his bed. When she returned several hours later, appellant was there, and he and B.C. were attempting to get L.M. to drink lots of water. P.S. stated that L.M. looked very sick, and that she had been vomiting. P.S. took L.M. into the bathroom to take a shower and then soak in the bathtub. While L.M. was in the bathtub, appellant came in and told L.M. that

8.

"it's okay, it's okay now."  P.S. told appellant to get out of the bathroom because it was not appropriate for him to see L.M. in the tub.  After she got L.M. cleaned up, they returned to the living room where L.M. drank more water and got sick again.  P.S. helped L.M. clean up for a second time.

{¶ 21} Appellant then asked if he and L.M. could spend the night.  P.S. refused and told appellant that he needed to take L.M. home.  After they left, appellant called and sent text messages asking again if they could spend the night.  P.S. responded that appellant needed to take L.M. to her home.

{¶ 22} Several days later, P.S. returned to her house after work, and got cleaned up like she normally does.  She then went into the living room where B.C. was in his wheelchair.  P.S. testified that when she left that morning, B.C. was in his bed, and that someone must have helped him up into his wheelchair.  P.S. assumed it was appellant.  P.S. testified, over objection, that B.C. said "You're not going to believe what [appellant] told me."  P.S. then relayed B.C.'s statements that appellant told him that he had sex with L.M. before he brought her to the house the night she was sick, and then again afterwards.  P.S. testified that B.C. was very upset, and almost in a state of disbelief.  B.C. kept referring to appellant as a pedophile, and stated that he did not want him in the house.  P.S. specified that B.C.'s hands were moving while he talked, his eyes were wide open, and his voice was a little raised.  P.S. described that it was like B.C. was disgusted and in disbelief about what he was saying.  P.S. testified that she had never seen B.C. act

9.

in that manner. B.C. explained that when appellant brought L.M. over, he almost had to carry her inside the house; she was unable to walk on her own.

{¶ 23} On cross-examination, P.S. testified that B.C. used a lot of drugs. He was prescribed Vicodin, Valium, and Fentanyl. In addition, he used cocaine and marijuana. P.S. testified that B.C. would sometimes sell his pain pills and his Fentanyl patches. B.C. would also use someone else's urine to pass drug tests. P.S. stated that B.C. had convictions for felonious assault, failure to comply, attempted murder, and kidnapping, and that he had spent ten years in prison. Finally, P.S. testified that the day when L.M. was intoxicated was in April because B.C.'s brother was there visiting for Easter.

{¶ 24} The last witness to testify for the state was special agent David Pauly of the Ohio Bureau of Criminal Investigations. Pauly testified that he interviewed L.M., and compared her statements to those L.M. made to other people. Pauly found that L.M.'s statements were consistent regarding the sexual acts.

{¶ 25} Pauly also testified about the effects of date rape drugs, noting that people who have ingested the drug can feel like they have had much more alcohol than they were actually drinking. In addition, they can have amnesia, nausea, vomiting, and hallucinations. Pauly testified that a good way to make the date rape drug undetectable is by drinking plenty of water and flushing the drug out of the body. He concluded that the facts in this case were consistent with the use of a date rape drug.

{¶ 26} Pauly next testified about the process of grooming, and how a predator would provide prizes, toys, or gifts, and then begin to introduce the child to drugs, sex,

10.

and pornography. Pauly testified that the facts in this case were consistent with grooming on the order of an eight or nine out of ten.

{¶ 27} Following the state's presentation of evidence, appellant moved for acquittal pursuant to Crim.R. 29, which the trial court denied.

{¶ 28} Appellant then called as his first witness, D.B., who knew appellant through her work at a truck stop. Appellant attempted to elicit testimony that D.B. received a rude phone call from L.B., accusing D.B. of being in a relationship with appellant. The state objected because appellant was trying to attack L.B.'s credibility by showing that L.B. treated another person badly. The trial court sustained the objection and D.B. provided no further relevant testimony.

{¶ 29} As his next witness, appellant called M.B., who used to work at a bar in Arcadia, Ohio. M.B. testified that he observed appellant and L.B. enter the bar and drink within the past few years, which was an attempt to impeach L.B.'s testimony that she has not had a drink since 2009.

{¶ 30} Appellant next called S.D., his son. S.D. testified that when he went to see "Project X," his dad bought tickets for himself, T.D., L.M., and a fourth juvenile, N. S.D. testified that appellant also purchased a ticket, and the five of them saw the movie together. S.D. stated that appellant never left the movie theater. S.D. also testified that he has observed a lot of drugs at B.C.'s house, and that B.C. bragged about selling drugs out of his house.

11.

{¶ 31} Appellant testified next in his own defense. Appellant testified that in 2011 and 2012, he was working as a truck driver and he would be gone for four weeks at a time, and then home for two nights. He testified that he has had his commercial driver's license since 2008, and as part of the licensure process he is subjected to random drug tests. Appellant testified that he has used marijuana and cocaine in his past when he was younger, but he does not use it now.

{¶ 32} Appellant then described his relationship with L.B. He testified that L.B. had anger issues, and whenever he returned home, L.B. would want to fight with him. Appellant testified that he had to call the police on L.B. several times, and one time she punched him in the mouth and broke his front teeth.

{¶ 33} Appellant next testified that he and B.C. had known each other since they were in the seventh grade. Appellant testified that if he was passing by B.C.'s house, or if B.C. called him because he fell out of his chair, appellant would stop to help him. However, appellant testified that he did not stay and hang out with B.C. all the time, and that he worked too much to help B.C. on a daily basis as P.S. had testified.

{¶ 34} Appellant was then asked about what it was like living in L.M.'s father's house. Appellant testified that it was not a very good household. He explained that he moved out because of all of the alcohol and screaming and yelling. He summarized that the family life was not healthy at all.

12.

**{¶ 35}** Regarding going to see the "Project X" movie, appellant testified that he took L.M., T.M., S.D., and N. He purchased the tickets and then stayed to watch the entire movie.

**{¶ 36}** Appellant's testimony then turned to the night of the alleged rape. Appellant stated that he had just gotten home from work and was leaving his house to go over to his father's house. When he walked out of his door he heard L.M. call his name. L.M. approached appellant and asked him for money. Appellant testified that he could smell alcohol on L.M.'s breath, so he told her to get in his car and he would take her to her dad's house. Appellant testified that L.M. was very angry and did not want to go home; she was cussing and screaming, and finally said "My dad is going to kill me."

**{¶ 37}** While they were driving, appellant received a call from B.C. saying that he had just fallen out of his chair, and asking appellant to come help him. Appellant testified that he drove to B.C.'s house. Once he pulled into the driveway, and before he could even put the car in park, L.M. hurried out of the car and ran into B.C.'s house. Appellant went inside and helped B.C. into his chair. He then told L.M. that he was going to take her back to her dad's house, but she refused. Appellant testified that he then called L.M.'s father, and told him where L.M. was and that he needed to come get her. Appellant then left.

**{¶ 38}** Later that evening, when appellant was at his parent's house, which is just a couple of houses down from B.C.'s house, L.M.'s dad called him and asked if he was still nearby and if he could bring L.M. back home. Appellant returned to B.C.'s house, and

13.

upon entering observed L.M. receiving a bath because she had vomited on herself. After the bath, L.M. got dressed and appellant took her back to her dad's house. L.M.'s dad smelled the alcohol on her breath, and called the police.

{¶ 39} Appellant testified that he did not use any drugs that day, nor did he have any alcohol. In addition, he testified that the event occurred in April, but not on the 24th. He also testified that he did not see L.B. at all on that day, and was not in his house in Rising Sun with L.M. at any time that day.

{¶ 40} Furthermore, appellant was adamant that he has never touched L.M. inappropriately, has never driven alone with L.M. to pick up his son, and has never been alone with L.M. at his parent's house.

{¶ 41} On cross-examination, appellant categorically denied the allegations against him, and testified that L.M., T.M., L.B., and P.S. were lying throughout their testimony. On re-direct, appellant explained that L.M., T.M., L.B., B.C., and P.S. were conspiring to bring the false charges against him because he and L.B. had an argument, which led to L.B. and B.C. selling all of appellant's possessions on May 21, 2012. Appellant went to B.C. and demanded his things back, and threatened that if B.C. did not give the things back, appellant would call the police and inform them of all the drugs that B.C. was doing in the house while the kids were there. Appellant testified that B.C. and P.S. coached L.M. to make the allegations against him, and that L.M. cooperated because she did not want to get into trouble for doing drugs at B.C's house.

14.

{¶ 42} After appellant testified, his cousin, J.M., took the stand. J.M. is also L.M.'s uncle. He testified that he lived with L.M.'s family, but not while appellant was living there. J.M. stated that he took care of getting the children ready for school and doing their homework because L.M.'s father worked a midnight shift, and thus was asleep during the day. J.M. testified that he then had to take on more responsibility because L.M.'s father had a bad drinking problem, which interfered with his ability to take care of his children. J.M. described that L.M.'s father had a very violent temper, and as a result, his children would try to lie to deflect their father's anger towards someone else. J.M. testified that appellant would help to try to calm L.M.'s father, and curb his vices. Finally, J.M. testified that the children have always acted out, and that their behavior has been the same before, during, and after appellant lived at the house.

{¶ 43} The last person to testify for the defense was appellant's mother, J.D. J.D. testified that appellant was a good kid, and that she could not believe that any of the allegations were true. J.D. also testified that L.M. has a reputation for not being truthful sometimes.

{¶ 44} After the defense rested, the state called two witnesses to rebut the testimony that there had been no change in L.M.'s behavior. The first to testify was L.S., L.M.'s grandmother. L.S. testified that prior to April 2012, L.M. was a typical, ornery kid. She was an honor roll student. She was artistic, and did a lot of painting, drawing, and writing short stories. She was always busy with school and friends. L.S. testified that after May 2012, L.M. kept to herself and did not have friends come by like before.

15.

L.M.'s room was a disaster, which it had not been before. When L.M. would paint, there would no longer be flowers or anything, it was just colors mixed together. L.M.'s grades dropped and she was no longer on the honor roll. L.S. also testified that L.M. began to cut herself in her stomach, and on her arms and legs. L.S. testified that she saw one cut that said "lonely" on L.M.'s leg.

{¶ 45} On cross-examination, L.S. testified that L.M. had been cutting herself as early as 2009. L.S. also acknowledged that L.M. was 14 years old during the time when L.S. described her room as a disaster.

{¶ 46} L.M. was the second witness to testify on rebuttal. She testified that after May 2012, her behavior changed and she had to go to a mental hospital. She had anxiety attacks and had to be put on medicines. She was cutting words into her skin, and tried to hang herself in her closet. L.M. testified that her behavior changed because part of her family told her that they did not want her around, and her dad did not say anything to her. She also testified that she was cutting a little before May 2012, but after that she began writing words like "lonely," "slut," and "fat" into her skin. Finally, L.M. showed the jury the scars on her forearm, which she said were two to three years old. L.M. testified that she no longer cuts herself.

{¶ 47} Following the presentation of evidence and closing arguments, the jury deliberated and returned a verdict of guilty as to all five counts. The trial court then ordered a presentence investigation report and set the matter for sentencing on November 3, 2015. At sentencing, the trial court, upon stipulation of the parties, merged

16.

Counts 2, 3, and 4 with Count 1, and proceeded to sentence on Counts 1 (rape) and 5 (gross sexual imposition). The court ordered appellant to serve 11 years in prison on Count 1, and 18 months in prison on Count 5. Further, the trial court ordered the terms to be served consecutively for a total prison term of 12 years and 6 months.

{¶ 48} Appellant timely appealed his conviction. Subsequent to his appeal, on March 22, 2016, appellant filed a petition to set aside his conviction. In his petition, appellant argued that he received ineffective assistance of trial counsel. Attached to his petition was an affidavit from his trial counsel, acknowledging that she was unprepared in her representation and forgot to call vital witnesses on behalf of appellant. Also attached were affidavits from appellant's father, mother, grandmother, and son, as well as five other individuals. The affidavits from appellant's father and mother stated that they received a phone message from B.C. before he died, in which he expressed his regret that he lied about appellant's statement that he had sex with L.M. Several of the affidavits also pertained to the lack of a couch or bed at appellant's residence in Rising Sun beginning on or around May 20, 2012. In addition, the attached affidavits challenged the testimony that appellant and L.M. left the "Project X" movie, and denied that appellant gave drugs or alcohol to L.M. or T.M., among other things.

{¶ 49} On April 21, 2016, the trial court entered its judgment denying appellant's petition. Appellant appealed the trial court's April 21, 2016 entry, and that appeal has been consolidated with the appeal from his conviction.

17.

## II. Assignments of Error

**{¶ 50}** Appellant now presents a combined six assignments of error:

1. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of the Ohio Constitution.

2. The trial court erred to the prejudice of appellant in allowing into evidence the hearsay statement of deceased witness, [B.C.].

3. The trial court committed error to the prejudice of appellant by imposing the costs of prosecution without consideration of appellant's present or future ability to pay.

4. The trial court erred to the prejudice of appellant in denying his Rule 29 motion upon completion of the state's case in chief.

5. The jury's verdict was against the manifest weight of the evidence.

6. The trial court abused its discretion and erred to the prejudice of appellant in denying appellant's petition for post conviction relief without granting appellant an evidentiary hearing to fully consider the merits of appellant's claim of ineffective assistance of counsel.

## III. Analysis

**{¶ 51}** For ease of discussion, we will address appellant's assignments of error out of order, beginning with his second assignment of error.

18.

**A. Admissibility of B.C.'s Out-of-Court Statement to P.S.**

{¶ 52} In his second assignment of error, appellant argues that the admission of B.C.'s testimony relaying appellant's statement that he had sex with L.M. violated appellant's right to confrontation under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

{¶ 53} The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." "[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Ohio v. Clark*, 135 S.Ct. 2173, 2180, 192 L.Ed.2d 306 (2015). "[I]n determining whether a statement is testimonial, 'standard rules of hearsay, designed to identify some statements as reliable, will be relevant.'" *Id.*, quoting *Michigan v. Bryant*, 562 U.S. 344, 358-359, 131 S.Ct. 1143, 1179 L.Ed.2d 93 (2011). "[T]he question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Id.*, quoting *Bryant* at 358. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.*, quoting *Bryant* at 359.

{¶ 54} Here, in light of all the circumstances, there is no support for the conclusion that the primary purpose of B.C.'s statements to P.S. was to create an out-of-court substitute for trial testimony. Indeed, the fact that B.C.'s statements were admitted under the excited utterance exception to the hearsay rule contained in Evid.R. 803(2)

19.

leads to the opposite result as the statements were "relate[d] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Here, B.C. made the statements to his girlfriend, P.S., because he was in a state of disbelief about what appellant had told him. This was not a case where B.C.'s statements were made in response to questions by law enforcement personnel as part of an investigation. Therefore, we hold that B.C.'s statements to P.S. were not testimonial in nature, and consequently appellant's rights under the Confrontation Clause were not violated by their admission.

{¶ 55} Notably, appellant does not argue in his second assignment of error that B.C.'s statements were improperly admitted as an excited utterance. However, he does reference the issue in his first and sixth assignments of error. Thus, we will address the issue, and we find that the trial court did not abuse its discretion in admitting B.C.'s statements to P.S. *See State v. Duncan*, 53 Ohio St.2d 215, 219, 373 N.E.2d 1234 (1978) ("[A]n appellate court should allow a wide discretion in the trial court to determine whether in fact a declarant was at the time of an offered statement still under the influence of an exciting event."). As a technical matter, this is not an example of hearsay within hearsay because although P.S. testified that B.C. told her that appellant told him that he had sex with L.M., appellant's statement to B.C. is not hearsay, but is an admission by a party-opponent under Evid.R. 801(D)(2). Thus, the only incidence of hearsay that we are confronted with is B.C.'s relation of appellant's statement to P.S.

20.

**{¶ 56}** The trial court admitted the statement under Evid.R. 803(2), which provides that a statement is not excluded by the hearsay rule if it is "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." A four-part test is used to determine whether a statement is admissible as an excited utterance:

(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration. (Emphasis sic.) *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166.

{¶ 57} Here, P.S.'s testimony from the trial indicates that the first thing B.C. said upon seeing her was "You're not going to believe what [appellant] told me." P.S. testified that when B.C. told her that appellant told him he had sex with L.M. before and after he brought her over, B.C. was almost in a state of disbelief; he was wide-eyed, his hands were moving, his voice was raised, and she had never seen him act in that manner. Based on this testimony, we hold that it was not an abuse of discretion for the trial court to conclude that appellant's admission that he had sex with an impaired minor was startling enough to produce a nervous excitement in B.C., and that the nervous excitement continued to dominate B.C.'s reflective faculties. Therefore, we conclude that the trial court properly admitted B.C.'s statements to P.S. as an excited utterance.

{¶ 58} Accordingly, appellant's second assignment of error is not well-taken.

### B. Denial of Appellant's Crim.R. 29(A) Motion

{¶ 59} In his fourth assignment of error, appellant argues that the trial court erred when it denied his Crim.R. 29(A) motion for acquittal after the state's presentation of evidence.

{¶ 60} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. In reviewing a conviction for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could

22.

have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 61} Appellant makes two separate arguments in support of his assignment of error. First, he argues that the state failed to establish the element of penetration for purposes of the charge of rape. R.C. 2907.02(A)(1)(c) provides,

> No person shall engage in sexual conduct with another who is not the spouse of the offender * * *, when any of the following applies: * * * (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

"Sexual conduct" is defined in R.C. 2907.01(A) as, "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶ 62} Here, we find that the fact of penetration is supported by L.B's testimony that she observed appellant standing naked with an erection between L.M.'s legs, and that L.M. had her pants down around her ankles. In addition, L.M. testified that the next day she "felt opened," and had severe pain in her lower stomach. Finally, P.S. testified that

23.

B.C. told her that appellant told him that he had sex with L.M. before and after the night he brought her to B.C.'s house. When viewed in the light most favorable to the prosecution, we hold that a rational trier of fact could have found from the evidence that appellant engaged in sexual conduct with L.M. Therefore, we hold that the trial court did not err when it denied appellant's Crim.R. 29(A) motion relative to the charge of rape.

{¶ 63} As his second argument, appellant contends that the state failed to establish venue for the count of gross sexual imposition. "Although it is not a material element of the offense charged, venue is a fact which must be proved in criminal prosecutions unless it is waived by the defendant." *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983). In this case, the charge of gross sexual imposition was based on appellant's conduct in having L.M. give him the three hand jobs.[2] Notably, the state does not contest that the hand jobs occurred outside of Wood County. Instead, it argues that all of appellant's acts constituted a course of conduct, and he was thus properly tried in Wood County, where the offense of rape occurred.

{¶ 64} R.C. 2901.12(A) provides, "The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and, except in cases of

---

[2] Appellant argues in his brief that venue was not established for four of the five charges, specifically Counts 2 through 5. However, Counts 2, 3, and 4 were based on the same conduct giving rise to the charge of rape in Count 1. It is not in dispute that the rape was alleged to have occurred at appellant's residence in Rising Sun, which is in Wood County, Ohio. Therefore, we will address appellant's venue claim only as it pertains to the hand jobs which formed the basis for the charge of gross sexual imposition under Count 5.

24.

emergency under section 1901.028, 1907.04, 2301.04, or 2501.20 of the Revised Code, in the territory of which the offense or any element of the offense was committed." R.C. 2901.12(H) continues:

> When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
>
> (1) The offenses involved the same victim, or victims of the same type or from the same group.
>
> (2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.
>
> (3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.
>
> (4) The offenses were committed in furtherance of the same conspiracy.
>
> (5) The offenses involved the same or a similar modus operandi.
>
> (6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

{¶ 65} Here, the evidence establishes that the crimes of rape and gross sexual imposition involved the same victim, that appellant and the victim maintained the same familial relationship throughout the abuse, and that appellant's objective during the crimes was to engage in sexual acts against the victim. Therefore, we hold that a rational trier of fact could have found that appellant's acts constituted a course of criminal conduct, and it was not error to find that appellant could be tried in Wood County. *See State v. Schee*, 6th Dist. Erie No. E-15-048, 2017-Ohio-212, ¶ 63 (venue proper in Erie County where the appellant sexually abused his step-daughter over several years in several different counties, but at least one of the offenses occurred in Erie County).

{¶ 66} Accordingly, we hold that the trial court did not err when it denied his Crim.R. 29(A) motion, and his fourth assignment of error is not well-taken.

## C. Manifest Weight

{¶ 67} In his fifth assignment of error, appellant argues that his convictions are against the manifest weight of the evidence. In reviewing a conviction as being against the manifest weight of the evidence, the court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

26.

{¶ 68} Appellant contends that the witnesses against him are unreliable. In particular, appellant notes that L.B.'s testimony was conflicting in that on one occasion she testified that she was afraid of being hurt by appellant, but on another occasion testified that she did not think that appellant would hurt her. She also testified to not using alcohol since 2009, but her testimony was impeached by M.B., who had seen her drinking and exhibiting lewd behavior at his bar since then. In addition, L.B. was not truthful with the Fostoria Police Department during her initial interview, but later sent a letter telling the "rest of her story."

{¶ 69} Appellant also challenges B.C.'s statement as being unreliable, noting that he was referred to as a liar, thief, and drug abuser, and that he tried to extort $1,000 from appellant. In addition, B.C. stated that appellant had sex with L.M. before and after she was at B.C.'s house, but appellant dropped L.M. off at her father's house after they left.

{¶ 70} Further, appellant argues that L.M. had been cutting herself since 2009, undermining the state's position that L.M.'s psychological problems began after the alleged sexual incidents. Moreover, L.M. had no knowledge or recollection of dates and times, and could not credibly testify to any timeline regarding the charges, or whether the rape occurred between April 16 to May 24, 2012, as listed in the indictment. Finally, appellant asserts that there is no physical or scientific evidence to support the charges.

{¶ 71} Upon consideration of the evidence, we do not find that this is the exceptional case in which the jury lost its way and created a manifest miscarriage of justice. The jury was able to observe the witnesses, their demeanors, gestures, and voice

27.

inflections, and concluded that the state's witnesses were more credible. L.M. testified in detail about three separate instances in which appellant made her give him a hand job. She also testified about the day that appellant gave her a drink that caused her to black out. L.B. testified that she observed appellant first with his hand up L.M.'s shirt, and then standing naked in between L.M.'s legs when L.M.'s pants were around her ankles. P.S. testified as to L.M.'s condition on the night she blacked out, and how appellant was encouraging her to drink copious amounts of water. P.S. also testified to B.C.'s relaying of appellant's admission to having sex with L.M. Appellant, for his part, denied all of the allegations, attempted to undermine the witnesses' credibility by depicting them as unfaithful, violent, and vengeful drug users, and theorized that all of the witnesses concocted the story as retaliation for appellant threatening to report that L.B. stole his possessions and that P.S. and B.C. were selling drugs, and possibly selling them to minors, out of their home. While there is competing evidence in the record, we do not find that the evidence weighs heavily against the conviction. Therefore, we hold that appellant's convictions are not against the manifest weight of the evidence.

{¶ 72} Accordingly, appellant's fifth assignment of error is not well-taken.

### D. Ineffective Assistance of Counsel

{¶ 73} In his first assignment of error, appellant argues that he was denied the effective assistance of counsel. To prevail on a claim of ineffective assistance, appellant must satisfy the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That is, appellant must demonstrate that

28.

counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Id.* at 687-688, 694. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697.

{¶ 74} Here, appellant presents a lengthy list of purported errors by trial counsel, which he argues undermined confidence in the outcome of the trial. Some of those errors include trial counsel's failure to call any witnesses to impeach the credibility of B.C.'s out-of-court statement during a pretrial hearing on the statement's admissibility, and her failure to argue the testimonial nature of B.C.'s out-of-court statement. In addition, appellant alleges that counsel failed to disclose potential witnesses and was thus limited in which witnesses could be called at trial. Of the witnesses that counsel did call, the testimony often went poorly and was not an effective impeachment of the state's witnesses' credibility. Moreover, appellant argues that his own testimony was a "disaster," suggesting a lack of preparation on the part of counsel. At one point, appellant fell apart on the stand, and the court had to take a recess so that appellant could compose himself. Appellant also argues that counsel was ineffective for failing to object on numerous occasions such as when Pauly testified about appellant using a date rape drug, or when L.M. displayed the scars on her arm from cutting herself.

29.

{¶ 75} Although appellant makes a concerted effort to establish that counsel's performance fell below an objective standard of reasonableness, we need not grade counsel's performance because appellant has not demonstrated that, but for the errors, the result of the proceeding would have been different.

{¶ 76} As to appellant's arguments relative to B.C.'s hearsay statement, we have held that they were not testimonial in nature, and were properly admitted under Evid.R. 803(2). To the extent that counsel could have undertaken further attacks on the credibility of those statements, we note that the record is replete with testimony that B.C. was a lying, lascivious, drug user. There is no indication that further testimony would have decisively impacted the statement's credibility.

{¶ 77} As to appellant's arguments regarding the other potential witnesses, the record does not reveal specifically what those other witnesses would have testified. However, if they were called for the purposes of attacking the credibility of L.B. and P.S., like with B.C. the record already contains multiple allegations of infidelity, violence, conspiracy, and drug use. Further testimony on those points would be superfluous.

{¶ 78} Regarding appellant's own testimony, we note that appellant was able to articulate his version of the events on direct examination, and was able to categorically deny all of the allegations against him on cross-examination. We further note that the worst instances of appellant's inability to effectively answer questions did not occur until re-direct examination when he was asked simply, "I'm just going to ask you why these

30.

people, and I'm talking about all three of them [L.M., L.B., and P.S.], would get together and make up a lie about this?  Please tell the jury."

{¶ 79} Finally, as to appellant's complaints over the failure to object, the record reflects that appellant had two attorneys representing him at trial.  In addition, appellant does not argue how the un-objected to evidence was inadmissible, or how it impacted the result of the trial given all of the other evidence presented.

{¶ 80} Therefore, we hold that appellant has not satisfied the second prong of the *Strickland* test, and his claim of ineffective assistance of counsel must fail.

{¶ 81} Accordingly, appellant's first assignment of error is not well-taken.

### E.  Petition for Postconviction Relief

{¶ 82} Related to his first assignment of error, in his sixth assignment of error appellant argues that the trial court erred in denying his petition for postconviction relief without a hearing.

{¶ 83} R.C. 2953.21(A)(1)(a) provides,

> Any person who has been convicted of a criminal offense or
> adjudicated a delinquent child and who claims that there was such a denial
> or infringement of the person's rights as to render the judgment void or
> voidable under the Ohio Constitution or the Constitution of the United
> States * * * may file a petition in the court that imposed sentence, stating
> the grounds for relief relied upon, and asking the court to vacate or set aside
> the judgment or sentence or to grant other appropriate relief.

**{¶ 84}** "[A] criminal defendant seeking to challenge his conviction through a petition for postconviction relief is not automatically entitled to a hearing." *State v. Calhoun*, 86 Ohio St.3d 279, 282, 714 N.E.2d 905 (1999). "Before granting an evidentiary hearing on the petition, the trial court shall determine *whether there are substantive grounds for relief * * *,* i.e., whether there are grounds to believe that 'there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.'" (Emphasis sic.) *Id.* at 282-283, quoting R.C. 2953.21(A)(1). "[A] trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58.

**{¶ 85}** In his postconviction petition, appellant again argues that he suffered the ineffective assistance of trial counsel. Attached to his petition was an affidavit from his trial counsel acknowledging that she was unprepared for trial and that she thus was unable to represent appellant adequately. In addition, the petition included numerous affidavits from individuals offering what testimony they would have provided had they been called as a witness. The additional affidavits follow several themes: (1) appellant was present throughout the entire "Project X" movie, (2) there was not a couch or bed at appellant's residence in Rising Sun as of May 17, 2012, (3) B.C. left a message with appellant's parents apologizing for lying about appellant's statement that he had sex with

32.

L.M., (4) T.M. was having a sexual relationship with P.S., and (5) in July 2012, L.B. expressed shock that L.M. would lie about the sexual allegations against appellant.

{¶ 86} In its decision, the trial court addressed these issues. The trial court examined trial counsel's affidavit, but determined that the alleged deficiencies would not have impacted the trial as the failures would have only led to evidence that was inadmissible or cumulative. Similarly, regarding the testimony about the "Project X" movie, the trial court found that L.M. and T.M. testified that appellant left, while appellant and S.D. testified that he stayed. The court determined that additional testimony from parties who were not identified at trial as being there would not have been impactful. As to the testimony concerning the absence of a couch and bed in the Rising Sun residence as of May 17, 2012, the trial court found that the evidence established that the rape occurred sometime between April 16 and May 24, 2012, thus testimony that shortened the window by only a few days would not have altered the outcome. Finally, the trial court addressed the remaining attacks on the witnesses' credibility. The court found that most of the statements would be excluded as hearsay, and other statements would be excluded as improper attacks against the character of witnesses not based on their truthfulness. The court determined that allowing appellant to call seven additional witnesses, none of whom have personal knowledge of the facts surrounding the crimes, would not be helpful and would have unduly delayed the trial.

{¶ 87} In his brief on appeal, appellant argues that his trial counsel's brief should be accepted as true, and that it is conclusive evidence that her performance in failing to

33.

investigate and prepare witnesses was below an objective standard of reasonableness. We disagree with appellant's position, and instead accept the reasoning cited by the state that "[a] defense counsel's self-confessed admission of deficient representation does not constitute ineffectiveness per se; it is just one factor to be considered in determining whether counsel was constitutionally ineffective." *United States v. Laird*, 6th Cir. No. 13-2220, 591 Fed. Appx. 332, 337, 2014 U.S. App. LEXIS 21611 (Nov. 12, 2014).

**{¶ 88}** Nevertheless, even if we were to accept that counsel's affidavit conclusively determines that her performance was below an objective standard of reasonableness, we still must determine whether appellant suffered any prejudice as a result. The trial court, in its decision, found that much of the additional testimony appellant sought to present would have been barred by the rules of evidence. In his brief on appeal, appellant does not provide any argument as to why the evidence would have been admissible. Furthermore, the trial court found that the evidence that would have been admissible would not have created a reasonable probability that the outcome of the trial would have been different. Upon our examination of the record and evidence attached to appellant's postconviction petition, we cannot say that the trial court's conclusion that appellant did not receive constitutionally ineffective assistance of counsel was unreasonable, arbitrary, or unconscionable. Therefore, we hold that the trial court did not abuse its discretion in denying appellant's petition without a hearing.

**{¶ 89}** Accordingly, appellant's sixth assignment of error is not well-taken.

34.

### F. Costs of Prosecution

**{¶ 90}** Finally, in his third assignment of error, appellant argues that the trial court erred when it ordered him to pay the costs of prosecution without considering appellant's ability to pay those costs.[3]

**{¶ 91}** In its November 4, 2015 judgment entry of conviction, the trial court ordered appellant to pay "the outstanding costs of this prosecution. Judgment is granted for all court costs due and owing Wood County and execution awarded." Notably, the trial court did not make any mention of imposing costs during the sentencing hearing on November 3, 2015.

**{¶ 92}** R.C. 2947.23(A)(1)(a) provides, "In all criminal cases * * * the judge or magistrate shall include in the sentence the costs of prosecution, including any costs under section 2947.231 of the Revised Code, and render a judgment against the defendant for such costs." This section "requires a sentencing court to impose the costs of prosecution against all convicted defendants." *State v. Wright*, 6th Dist. Wood No. WD-11-079, 2013-Ohio-1273, ¶ 5, citing *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 8. Because the imposition of costs pursuant to R.C. 2947.23 is mandatory, this court has held that "[t]he trial court is not required to hold a hearing or otherwise determine an offender's ability to pay before ordering him to pay such costs."

---

[3] Appellant also argues that the trial court erred in failing to conduct an inquiry into appellant's ability to pay the costs of confinement. However, the trial court's sentencing entry does not order appellant to pay the costs of confinement. Thus, appellant's argument is irrelevant.

35.

*State v. Riegsecker*, 6th Dist. Fulton No. F-03-022, 2004-Ohio-3808, ¶ 10. Therefore, we hold that the trial court did not err by ordering appellant to pay the costs of prosecution without first determining his ability to pay.

{¶ 93} Accordingly, appellant's third assignment of error is not well-taken.

{¶ 94} As a final matter, the state raises an issue not addressed by appellant in his brief. The state concedes that the trial court erred by not informing appellant at the sentencing hearing that it was imposing the costs of prosecution. In *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, ¶ 22-24, the Ohio Supreme Court held that the failure to orally notify the defendant that it was imposing court costs denied the defendant the ability to seek a waiver of the costs. The court held that that the remedy for such failure was a limited remand to the trial court for the purpose of allowing the defendant to file a motion with the court for a waiver of the payment of court costs. *Id.* at ¶ 23. Therefore, we remand the matter to the trial court for the limited purpose of allowing appellant to file a motion for waiver of the costs of prosecution.

### IV. Conclusion

{¶ 95} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgments of the Wood County Court of Common Pleas are affirmed. We nevertheless remand the matter to the trial court for the limited purpose of

allowing appellant to file a motion seeking waiver of the costs of prosecution. Should

appellant file such a motion, the trial court should rule upon it within a reasonable time.

Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgments affirmed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.            _____
                                                    JUDGE

James D. Jensen, P.J.            

                                                   _____
Christine E. Mayle, J.                          JUDGE
CONCUR.

                                                   _____
                                                    JUDGE